**Noah T.  Barish,** OSB #105847
nbarish@mbjlaw.com
MCKANNA BISHOP JOFFE, LLP
1635 NW Johnson Street
Portland, OR 97209
Telephone: 503-821-0960
Facsimile: 503-226-6121
Attorneys for (Proposed) *Amicus Curiae*
Oregon AFL-CIO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

[PORTLAND DIVISION]

| | |
|---|---|
| CASALA, LLC, dba Bubble's Hash, an Oregon limited liability company; and REC REHAB CONSULTING LLC, dba Ascend Dispensary, an Oregon limited liability company, | Case No. 3:25-cv-00244-SI |
| | (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS |
| Plaintiffs, | |
| v. | |
| TINA KOTEK, Governor of the State of Oregon, in her official capacity; DAN RAYFIELD, Attorney General of the State of Oregon, in his official capacity; DENNIS DOHERTY, Chair of the Oregon Liquor and Cannabis Commission, in his official capacity; and CRAIG PRINS, the Executive Director of the Oregon Liquor and Cannabis Commission, in his official capacity, | |
| Respondent. | |

**(PROPOSED) *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS**

**TABLE OF CONTENTS**

Page

I.   IDENTITY AND INTEREST OF *AMICUS CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   The balance of equities and the public interest favor denying Plaintiffs'
       request for a preliminary injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       1.   The licensed cannabis industry in Oregon is a uniquely dangerous
           place to work due to the cash-only nature of the industry. . . . . . . . . . . . . 5

       2.   Cannabis employees personally explain the unsafe conditions of
           their cannabis industry jobs, which go far beyond just the risk of
           armed robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       3.   Labor organizations are uniquely positioned to provide vulnerable
           cannabis workers with information about their labor rights. . . . . . . . . . . 11

       4.   Measure 119 serves the public interest by safeguarding cannabis
           workers' access to information about their labor rights . . . . . . . . . . . . . . 13

    B.   The NLRA does not preempt Measure 119 under either *Garmon* or
       *Machinists* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       1.   A "labor peace agreement" under Measure 119 is not a traditional
           "neutrality agreement." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       2.   The NLRA does not preempt Measure 119 under *Garmon* . . . . . . . . . . 16

           a.   Measure 119 does not impede employees' rights to choose
              their own exclusive representative . . . . . . . . . . . . . . . . . . . . . . . . 17

           b.   The text of Measure 119 does not restrict employer speech
              regarding the employer's views on unionization . . . . . . . . . . . . 17

           c.   The NLRA does not grant an employer independent
              statutory free speech rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            d.      Even if *Garmon* preemption applied to Measure 119, the
"local feeling and responsibility" exception would apply . . . . . . 23

       3.      The NLRA does not preempt Measure 119 under *Machinists* . . . . . . . . 25

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

Page

## Cases

*Belknap, Inc. v. Hale*,
    463 U.S. 491 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Chamber of Commerce of the United States v. Brown*,
    554 U.S. 60 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 26-28

*Chamber of Commerce of the United States v. Lockyer*,
    463 F.3d 1076 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Coal. for Econ. Equity v. Wilson*,
    122 F.3d 718 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ctrl Alt Destroy v. Elliott*, No. 24-CV-753 TWR (AHG),
    2025 U.S. Dist. LEXIS 45251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Dal-Tex Optical Co., Inc.*,
    137 NLRB 1782 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Farmer v. United Bhd. of Carpenters & Joiners*,
    430 U.S. 290 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174*,
    598 U.S. 771 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Great W. Broad. Corp. v. NLRB*,
    310 F.2d 591 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hahn Property Management Corp.*,
    263 NLRB 586 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hotel Emps., Rest. Emps. Union, Local 2 v. Marriott Corp.*,
    961 F.2d 1464 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Int'l Ass'n of Machinists & Aero. Workers v. Wis. Emp't Relations Comm'n*,
    427 U.S. 132 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 21, 22, 25-29

*Int'l Union UAW v. Dana Corp.*,
    278 F.3d 548 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Letter Carriers v. Austin*,
    418 U.S. 264 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Linn v. United Plant Guard Workers*,
    383 U.S. 53 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

*Linthicum v. Wagner*,
    707 F. Supp. 3d 1003 (D. Or. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Milne Emps. Ass'n v. Sun Carriers, Inc.*,
    960 F.2d 1401 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*NLRB v. Gissel Packing Co.*,
    395 U.S. 575 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*NLRB v. LaSalle Steel Co.*,
    178 F.2d 829 (7th Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*NLRB v. Virginia Electric & Power Company*,
    314 U.S. 469 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Rosewood Mfg. Co., Inc.*,
    263 NLRB 420 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-19, 21-26

*SEIU v. St. Vincent Med. Ctr.*,
    344 F.3d 977 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Threshold Enters. v. Pressed Juicery, Inc.*,
    445 F. Supp. 3d 139 (N.D. Cal. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*UAW-Labor Emp't & Training Corp. v. Chao*,
    325 F.3d 360 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United Auto., etc. v. Wis. Emp't Relations Bd.*,
    351 U.S. 266 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Von Koenig v. Snapple Bev. Corp.*,
    713 F. Supp. 2d 1066 (E.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Winter v. NRDC*,
    555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc.*,
    475 U.S. 282 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

<u>Statutes</u>

2018 Or. Laws c. 103 § 13, *codified at* ORS 475C.531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2022 Or. Laws c. 117 § 2, *codified at* ORS 475C.287 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 U.S.C. § 158(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

29 U.S.C. § 411(a)(2) (1964 ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

OAR 845-025-1230(6)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OAR 845-025-1230(6)(b) & (9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OAR 845-025-1450 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OAR 845-025-2120(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OAR 845-025-2880 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OAR 845-025-1000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ORS 475C.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ORS 475C.097 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ORS 475C.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ORS 475C.177 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ORS 475C.257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ORS 475C.345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ORS 475C.349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ORS 475C.353 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ORS 475C.833 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ORS 475C.840 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ORS 663.110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 18

<u>Other Authorities</u>

Aaron Smith, *Budtenders Arm Themselves As Gunmen Target Cannabis
Dispensaries*, Forbes, June 1, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Cal. Govt. Code Ann. §§ 16645.1 to 16645.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Cong. Rec. H7965-66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Guy Tauer, *Oregon's Marijuana Industry and Employment Trends*,
State of Oregon Employment Department (October 15, 2024) . . . . . . . . . . . . . . . . . . . . . 5

H.R. Rep. No. 510, 80th Cong., 1st Sess., 45 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Jami Seymore, *String of Portland Robberies Highlight Cannabis Industry's
Vulnerability*, KOIN, February 2, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Jayati Ramkrishnan, *44-Year Old Man Killed During North Portland
Dispensary Robbery*, The Oregonian, December 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . 6

National Labor Relations Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-25, 29

*Police: Bend Man Tries to Shoot Marijuana Dispensary Worker During Robbery,
But Gun Fails; Suspect Arrested,* Central Oregon Daily News, July 23, 2024 . . . . . . . . . . . . . . 7

Recreational Marijuana Program Compliance Education Bulletin,
Bulletin CE2025-03, March 12, 2025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Robert A. Gorman & Matthew W. Finkin, *Labor Law Analysis and Advocacy* 212 (2013) . . . . 19

SAFE Banking Act of 2019*, H.R. 1595, 116th Cong. (2019); SAFE Banking
Act of 2021, H.R. 1996, 117th Cong. (2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Sophie Peel, *A Weed Robbery Spree Strikes Portland Cannabis Shops,
Even as Police Are Stretched Thin*, Willamette Week, August 18, 2020 . . . . . . . . . . . . . . . . . . 6

Tess Riski, *For Nearly a Year Teenagers Have Been Robbing Portland Dispensaries. Then Somebody Shot a Budtender.* Willamette Week, March 3, 2021 . . . . . . . . . . . . . . . . . . . 6-8

*The Big Problem for Marijuana Companies?What to Do With All That Cash?*, Jeff Merkley Senator for Oregon (April 1, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Zaeem Shaikh, *Oregon Regulators Warn Portland Area Cannabis Businesses of Increase in Burglaries, Armed Robberies*, The Oregonian, March 24, 2025 . . . . . . . . . . . . . . 7

Zaeem Shaikh, *Portland Cannabis Store, Site of Shooting Deaths, Had Been Target of Multiple Armed Robberies*, The Oregonian, October 4, 2024 . . . . . . . . . . . . . . . . 7

## I.    IDENTITY AND INTEREST OF *AMICUS CURIAE*

The Oregon American Federation of Labor - Congress of Industrial Organizations ("AFL-CIO") is a federation of labor unions in the state of Oregon representing more than 300,000 working people including the members of over 280 affiliated local unions as well as non-union workers through Working America, the community affiliate of the AFL-CIO. The Oregon AFL-CIO is a voice for all workers – whether they have access to a union or not. The federation engages in assisting unions in organizing, political education campaigns, legislative advocacy, building labor-community partnerships, and providing education and training.

Oregon AFL-CIO's interest in this litigation is in advancing the rights of affiliated labor union and non-union workers throughout the State of Oregon, as well as educating workers – whether they are in a union or not – about their labor rights and protections. To that end, the Oregon AFL-CIO supports the policy adopted by the electorate in Measure 119 of facilitating the dissemination of information to cannabis industry workers about their labor rights.

## II.    SUMMARY OF ARGUMENT

Oregon AFL-CIO supports the Defendants in opposing Plaintiffs' requested preliminary injunction of Measure 119. First, the balance of equities and the public interests favor denying an injunction because Measure 119 furthers an important state interest in facilitating labor unions disseminating information about labor rights to cannabis industry workers, whose working conditions are extraordinarily dangerous. Second, Measure 119 is not preempted by the National Labor Relations Act (NLRA) under either *Garmon* or *Machinists* for several reasons.

### III.    ARGUMENT

#### A.    The balance of equities and the public interest favor denying Plaintiffs' request for a preliminary injunction.

The balance of equities and the public interest both weigh against enjoining Measure 119. A plaintiff seeking a preliminary injunction must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). When the government is a party, the last two factors of the preliminary injunction analysis—the balance of equities and the public interest—will merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, balance of equities and public interest considerations all favor the State.

As a threshold matter, enjoining Measure 119, an enactment by the electorate, would inherently harm the public interest. *See Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."); *Linthicum v. Wagner*, 707 F. Supp. 3d 1003, 1012 (D. Or. 2023) (finding that it would not be in the public interest to grant an injunction against Oregon Measure 113 to allow plaintiffs to "effectively negate a lawfully enacted measure"). But there are even more specific and vital public interests at stake, namely, the safety and labor protections of cannabis workers in Oregon. As discussed below, cannabis employment features unique dangers and risks for employees, and unions are uniquely equipped to provide information to those employees about their labor rights. Measure 119 furthers the public interest in disseminating information about workers' legal protections to employees facing significant danger and other negative workplace conditions.

Page 4 - (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

1.     **The licensed cannabis industry in Oregon is a uniquely dangerous place to work due to the cash-only nature of the industry.[1]**

According to data from the Oregon Employment Department, as of the first quarter of 2024, Oregon had approximately 4,500 jobs in the cannabis industry, mostly consisting of cannabis dispensary workers. Guy Tauer, *Oregon's Marijuana Industry and Employment Trends*, State of Oregon Employment Department (October 15, 2024), https://www.qualityinfo.org/-/oregon-s-marijuana-industry-and-employment-trends-1. Because the federal Controlled Substances Act designates cannabis as a controlled substance, most financial institutions refuse to bank state-licensed cannabis businesses, and credit card processors like Visa and Mastercard refuse to process cannabis-related transactions, leaving licensed cannabis businesses and their employees to transact mainly in cash. *The Big Problem for Marijuana Companies?What to Do With All That Cash?*, Jeff Merkley Senator for Oregon (April 1, 2024), https://www.merkley.senate.gov/the-big-problem-for-marijuana-companies-what-to-do-with-all-that-cash/.

Congress has recognized the danger that all-cash cannabis businesses pose as targets of robbery and other violent crime, placing cannabis employees directly in harms way. The U.S. House of Representatives passed multiple versions of a bill protecting banking institutions that offer services to legitimate cannabis businesses.  *See* SAFE Banking Act of 2019*,* H.R. 1595, 116th Cong. (2019); SAFE Banking Act of 2021, H.R. 1996, 117th Cong. (2021). In the floor debate on one such iteration of that legislation, the Secure and Fair Enforcement (SAFE)

---

[1]  Pursuant to Fed. R. Evid. 201, Oregon AFL-CIO requests that the Court take judicial notice of all media reports, public entity reports, and Congressional records cited in this section, none of which are subject to reasonable dispute. *Threshold Enters. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) (websites and their contents are subject to judicial notice); *Von Koenig v. Snapple Bev. Corp.*, 713 F. Supp. 2d 1066, 1073 (E.D. Cal. 2010) (publicly available government records are commonly subject to judicial notice).

Banking Act of 2019, Representative Perlmutter explained the conundrum succinctly: "Most importantly, Mr. Speaker, this [bill] will also reduce the risk of violent crime in our communities. These businesses *and their employees become targets for murder, robbery, assault, and more by dealing in all cash, and this puts the employees and store owners at risk*." Cong. Rec. H7965-66 (statement of Rep. Perlmutter) (daily ed. September 25, 2019) (available at

https://www.govinfo.gov/content/pkg/CREC-2019-09-25/html/CREC-2019-09-25-pt1-PgH7962-2.htm (emphasis added). Representative Waters reiterated: "The Financial Services Committee heard testimony in February that these cash-only businesses *and their employees have become targets for violent criminals*." *Id.* at H7969 (statement of Rep. Waters) (emphasis added).

Sadly, these painful effects are felt here in Oregon as well. For example, in 2020 and 2021, Portland dispensaries were hit with a spate of armed robberies, one of which resulted in the murder of dispensary worker Michael Arthur. Sophie Peel, *A Weed Robbery Spree Strikes Portland Cannabis Shops, Even as Police Are Stretched Thin*, Willamette Week, August 18, 2020 (available at https://www.wweek.com/news/courts/2020/08/18/a-weed-robbery-spree-strikes-portland-cannabis-shops-even-as-police-are-stretched-thin/); Jayati Ramkrishnan, *44-Year Old Man Killed During North Portland Dispensary Robbery*, The Oregonian, December 15, 2020 (available at https://www.oregonlive.com/crime/2020/12/44-year-old-man-killed-during-north-portland-dispensary-robbery.html); Tess Riski, *For Nearly a Year Teenagers Have Been Robbing Portland Dispensaries. Then Somebody Shot a Budtender.* Willamette Week, March 3, 2021 (available at https://www.wweek.com/news/courts/2021/03/03/for-nearly-a-year-teenagers-have-been- robbing-portland-dispensaries-then-somebody-shot-a-budtender/). Arthur was working at Cured Green, a North Portland dispensary, when he was shot and killed during a

robbery at the business. *Id.* Arthur's death was a tragic example of violence affecting cannabis workers, but it was certainly not the end of dangers they face.

Oregon cannabis business and their employees continued suffering harrowing attacks in 2023, 2024, and 2025. In a five-month span in 2023, five different Portland dispensaries were hit in a string of armed robberies. Jami Seymore, *String of Portland Robberies Highlight Cannabis Industry's Vulnerability*, KOIN, February 2, 2024 (available at https://www.koin.com/news/oregon/string-of-portland-robberies-highlight-cannabis-industrys-vulnerability/). In July 2024, a cannabis dispensary employee in Bend was hit in the face, threatened with a handgun, and then nearly shot twice during a robbery; fortunately, the gun malfunctioned and two other employees subdued the shooter. *Police: Bend Man Tries to Shoot Marijuana Dispensary Worker During Robbery, But Gun Fails; Suspect Arrested,* Central Oregon Daily News, July 23, 2024 (available at https://www.centraloregondaily.com/police-bend-man-arrested-tried-to-shoot-marijuana-dispensary-employee-during-robbery/article_0a1e65bb-8177-5f14-a13d-65e1b85991b4.html). In October 2024, two non-employees were shot dead at a St. Johns cannabis dispensary. Zaeem Shaikh, *Portland Cannabis Store, Site of Shooting Deaths, Had Been Target of Multiple Armed Robberies*, The Oregonian, October 4, 2024 (available at https://www.oregonlive.com/crime/2024/10/2-people-shot-to-death-at-n-portland-cannabis-store-police-say-homicide-pace-surpasses-2023.html). Finally, earlier this month, Portland-area cannabis businesses suffered a spate of "crash and grab" burglaries where suspects used stolen cars to smash through store entrances, grab product and cash, and then flee. Zaeem Shaikh, *Oregon Regulators Warn Portland Area Cannabis Businesses of Increase in Burglaries, Armed Robberies*, The Oregonian, March 24,

2025 (available at https://www.oregonlive.com/crime/2025/03/oregon-regulators-warn-portland-area-cannabis-businesses-of-increase-in-burglaries-armed-robberies.html).

Following the most recent string of attacks, on March 12, 2025, the Oregon Liquor and Cannabis Commission (OLCC) issued a compliance bulletin recommending that businesses take special precautions. Recreational Marijuana Program Compliance Education Bulletin, Bulletin CE2025-03, March 12, 2025 (available at https://www.oregon.gov/olcc/marijuana/Documents/Bulletins/CE2025-03%20Armed%20Robberies%20and%20Burglaries.pdf ). The bulletin noted particular risks to employees around the opening and closing times for businesses, when armed robberies typically occur. *Id.* Clearly, Oregon employees of cannabis businesses face extreme risks of violence in the workplace.

The unsafe conditions for cannabis workers are especially well-known to one of the Plaintiffs in this matter. Plaintiff Rec Rehab Consulting LLC, which does business as Ascend Dispensary, was one of the Portland cannabis shops notably victimized by armed robberies. Owner Bret Born, who submitted a declaration in support of Ascend's motion to enjoin Measure 119, spoke to Fortune magazine extensively about his business being robbed at gunpoint. Aaron Smith, *Budtenders Arm Themselves As Gunmen Target Cannabis Dispensaries*, Forbes, June 1, 2021 (available at https://www.forbes.com/sites/aaronsmith/2021/06/01/budtenders-arm-themselves-as-gunmen-target-cannabis-dispensaries/). Born described how two Ascend employees, including his own stepson, were victims of an armed robbery at the shop. *Id.* ("'They had my stepson at gunpoint and laid him out execution style,' [Born] said"). The Ascend robbery was covered by local media as well, including linking harrowing surveillance video of the robbery itself. *For Nearly a Year Teenagers Have Been Robbing Portland Dispensaries. Then*

Page 8 - (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

*Somebody Shot a Budtender.*, Willamette Week, March 3, 2021 (available at

https://www.wweek.com/news/courts/2021/03/03/for-nearly-a-year-teenagers-have-been-robbing
-portland-dispensaries-then-somebody-shot-a-budtender/). It is undeniable that cannabis

employees in Oregon literally put their lives at stake just by arriving at the workplace.

>        2.    **Cannabis employees personally explain the unsafe conditions of their cannabis industry jobs, which go far beyond just the risk of armed robbery.**

The Court need not rely solely on government reports or media statements, but can

understand the dangers inherent in cannabis employment from cannabis workers themselves.

Jo Farley worked as a budtender at two different cannabis dispensaries in Portland

between 2019 and 2022. Farley Decl. ¶ 3. Farley describes cannabis employment as far more

dangerous than other forms of retail employment they have worked in, because the all-cash

transactions and portability of the product make cannabis shops a target for robbery. *Id.* at ¶ 5.

At Farley's second job, they estimate that the store generated cash sales of $10,000 to $20,000

per day, but that cash was only collected from the store's safe between once a week and once a

month. *Id.* Thus, Farley estimates that, at times, there could have been in excess of $200,000 in

cash on premises, in addition to the value of the cannabis product. *Id.* Despite this huge amount

of cash on hand, the store had almost no security measures to deter or protect against armed

robbery: no live security guard, no controlled entrance, and apparently non-functional panic

buttons. *Id.* It was not surprising, therefore, that this dispensary had suffered a break-in attempt

from someone smashing through the wall of the office where the safe was kept. *Id.*

Farley also describes other unsafe conditions of cannabis employment beyond the threat

of armed robbery. Specifically, the ID and age restrictions for purchasing cannabis created high

tensions that sometimes led to verbal or physical violence. *Id.* at ¶ 6. Once, an individual without proper identification who was denied the right to buy cannabis at Farley's place of employment physically beat a dispensary customer who had refused to purchase cannabis on his behalf. *Id.* Farley also explains that they were often verbally assaulted by customers when they refused to sell them cannabis because they lacked valid ID. *Id.* The dispensary also seemed to attract individuals who were intoxicated, suffering mental illness, or were otherwise unwell. *Id.*

Further, Farley's cannabis employment was characterized by low wages, no benefits, and an atmosphere of inattention to and disregard for labor rights. *Id.* at ¶ 7. For example, in both of their cannabis positions, Farley was required to waive their rights to workers compensation coverage by their employers. *Id.* In their second cannabis position, Farley was not encouraged to take their legally-mandated meal and lunch breaks, received handwritten paychecks, and was surrounded by co-workers who believed that because the licensed cannabis industry evolved from an underground and formerly illegal market, there were no labor protections that applied to workers there at all. *Id.*

Another cannabis employee, Lindsey Norden, has experienced similar conditions. Norden is a current employee of a different cannabis dispensary in Portland. Norden Decl. at ¶ 2. Norden likewise describes the cannabis industry as far more risky than other previous work environments. *Id.* at ¶ 3. Norden reiterates that because of the all-cash nature of the cannabis industry, people know that dispensaries keep a lot of cash on hand. *Id.* At Norden's shop, like at Farley's, there is no security guard and no controlled entry. *Id.* at ¶ 4. Even more worrisome, Norden often works in the shop alone without any other employee or manager. *Id.* There is not even anywhere that Norden or another employee could hide securely in the event of a robbery,

because the lock on the door to the back office was damaged almost a year ago during an after-hours burglary and has still not been repaired. *Id.*

Like Farley, Norden also experiences unsafe customer interactions with frequency. For example, Norden describes customers in "all different states of mind" entering the shop, some carrying weapons. *Id.* at ¶ 5. Norden explains that customers get irate if they have to wait in line to purchase cannabis, or if their preferred product is unavailable. *Id.* Customers behave abusively and Norden has had to eject them from the store on her own. *Id.*

Norden also describes other working conditions that make her vulnerable to exploitation as a worker. Her wage is just above the state minimum wage, and has risen only $.50 per hour in the last two years. *Id.* at ¶ 6. Though she gets tips as well, they must be pooled and split with her manager equally, even if he does a minimal amount of work in the shop during her shift. *Id.* Her manager has told her and other employees to be grateful that they even get paid on time, as many other dispensary workers in the industry do not. *Id.*

In sum, not only do cannabis workers in Oregon arrive daily at workplaces that are under constant threat of armed robbery, but they also interact with intoxicated, mentally ill, or verbally abusive customers, with little security protection and in an atmosphere where labor protections are implicitly and explicitly undermined. This toxic mix of working conditions makes Oregon's cannabis workers extremely vulnerable and explains the value in disseminating trusted information about labor protections.

### 3. Labor organizations are uniquely positioned to provide vulnerable cannabis workers with information about their labor rights.

Both Farley and Norden's experiences illustrate the beneficial role that labor organizations can play in disseminating factual information about the labor protections that exist

Page 11 - (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

for cannabis workers. Both describe interactions with a labor organization, UFCW Local 555, before the implementation of Measure 119, where they and their co-workers received valuable information about their labor rights.

In August 2022, Farley and another co-worker reached out to UFCW Local 555 for assistance in creating a union at their workplace to stand up for the rights of the workers there. Farley Decl. ¶ 8. The union organizer provided Farley and their co-workers with useful information about their rights to unionize, the steps they could take to seek recognition as a union, and the protections against being fired for organizing and communicating about organizing. *Id.* The union organizer also provided information about other labor protections, including those related to wages and breaks. *Id.* Farley found the information about labor rights they received from the union particularly helpful when the employer began to spread misinformation to co-workers. *Id.* at ¶ 9. Though Farley and their other co-worker leading the unionization effort were fired in retaliation for their organizing and the union drive failed, Farley explains that "[h]aving the union be able to provide me and my co-workers with accurate information about our labor rights was key to our efforts to organize our union and improve our working conditions, even though that effort was ultimately unsuccessful." *Id.* at ¶ 11. In other words, for Farley and their co-workers, receiving information from a union about their labor protections was valuable to educate them about the option to organize a union, but did not in the end lead to that outcome.

Norden's experience was similar, but with a different ultimate outcome. In late 2023, Norden contacted several labor organizations and eventually connected with UFCW Local 555 in order to address her and her co-workers' concerns about their treatment in the workplace. Norden

Decl. at ¶ 7. She and a co-worker spoke with a union organizer and learned about the legal

process to be recognized as a union through an election, their rights to work together with their

co-workers to improve their working conditions, their rights not to be retaliated against for

organizing, and their rights to wear union insignia on the job. *Id.* Receiving accurate information

about their labor rights from the union was useful for Norden and her co-workers, especially

when their employer sought to persuade them not to form a union. *Id.* at ¶ 8. Norden and her co-

workers eventually voted to be represented by a union and are now in the process of bargaining

their first labor contract with their employer, through which they hope to secure improvements in

their working conditions. *Id.* at ¶ 9.

Both Farley and Norden's experiences receiving information about labor rights from a

labor organization are instructive. The union provided information to them and their co-workers

about legal rights to organize, to be free from retaliation from their employer, and also other

related legal protections for workers. This dissemination of information about labor rights did not

prevent their employers from expressing their stance against unionization. One cannabis

workplace unionized and the other did not, but at least the workers at both employers were

connected with a knowledgeable and trusted source of information about their rights and

protections.

> ### 4. Measure 119 serves the public interest by safeguarding cannabis workers' access to information about their labor rights.

Based on the foregoing, it is evident that Measure 119 serves an important public interest

of the State and that the balance of equities disfavors enjoining Measure 119. The text of

Measure 119 is narrowly drafted to require *only* that cannabis employers agree to remain neutral

concerning unions' communications with cannabis employees about those employees' labor

rights. Measure 119, Section 3(g) (defining "labor peace agreement" as "an agreement under which, at a minimum, an applicant or licensee agrees to remain neutral with respect to a bona fide labor organization's representatives communicating with the employees of the applicant or the licensee about the rights afforded to such employees under ORS 663.110"). Measure 119 does not, as Plaintiffs contend, require an employer to remain neutral regarding its opinions on unionization.

With its narrow scope, Measure 119 essentially safeguards cannabis employees' access to information about their own labor rights, and only restricts cannabis employers from misleading them about the existence of those rights. The substantial public good in this policy is plainly evident. As discussed above, cannabis employees arrive daily at some of the most dangerous workplaces in the State, which are active targets for armed robbers looking for large stashes of cash kept on hand because of the all-cash nature of the industry. These robberies have killed and injured Oregon cannabis workers and are so frequent that the State's cannabis regulator just this month warned all cannabis employers and employees to be on alert amid an uptick in armed robberies and after-hours burglaries. Cannabis workers, in their own telling, also face unstable and aggressive customers, some of them armed, who are unhappy when denied their drug of choice due to the workers' enforcement of state ID requirements. Cannabis employees face these dangers in shops with minimal security measures and sometimes while working alone. Low-wage cannabis employees are also vulnerable to employer exploitation through lax enforcement of labor laws in an industry with an illicit history that still exists in a legal grey zone.

Within this context, Measure 119 seeks to facilitate labor unions providing information about labor rights to cannabis workers without the cannabis employer being able to deny the

existence of those rights. As cannabis workers themselves have shared, receiving information

from a labor organization about their labor rights is important and empowers them to seek

improvements in their working conditions. But merely receiving such information from a union

did not prevent their cannabis employers from advocating against unionization, with varying

results, and Measure 119 does not now disrupt that.

In sum, Measure 119 serves an important public interest of safeguarding cannabis

employees' access to information about their labor rights in workplaces fraught with physical

danger and other toxic working conditions, yet does not burden cannabis employers' ability to

speak freely regarding whether those workers should unionize. The balance of equities and the

public interest therefore weighs strongly against enjoining Measure 119.

**B.**    **The NLRA does not preempt Measure 119 under either *Garmon* or *Machinists*.**

    **1.**    **A "labor peace agreement" under Measure 119 is not a traditional "neutrality agreement."**

Plaintiffs repeatedly equate Measure 119's "labor peace agreement" requirement with a

"neutrality agreement." Those two things are distinct, as a close reading of Measure 119's text

reveals. Measure 119 defines a "labor peace agreement" as:

> [A]n agreement under which, at a minimum, an applicant or licensee agrees to
> remain neutral with respect to a bona fide labor organization's representatives
> communicating with the employees of the applicant or the licensee about the
> rights afforded to such employees under ORS 663.110.

Measure 119, Section 3(g).

By contrast, a "neutrality agreement" typically requires that the employer remain

completely neutral regarding its opinions on unionization during an organizing campaign. *See,*

*e.g.*, *Hotel Emps., Rest. Emps. Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1466 n.2 (9th

Page 15 - (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

Cir. 1992) (quoting the relevant neutrality clause as stating that "[t]his agreement is made with the specific understanding that Marriott will not express any opinion whether employees hired at these two properties should authorize [the union] as their collective bargaining agent"); *SEIU v. St. Vincent Med. Ctr.*, 344 F.3d 977, 984 (9th Cir. 2003) (comparing standard provisions of neutrality agreements); *see also Int'l Union UAW v. Dana Corp.*, 278 F.3d 548, 557 (6th Cir. 2002) (collecting cases and summarizing various forms of neutrality agreements).

Measure 119 does not require an employer to remain completely neutral regarding its opinions on unionization. It only requires that an employer remain neutral regarding the *union*'s communication of basic labor rights information to employees.

### 2.    The NLRA does not preempt Measure 119 under *Garmon*.

"Under *Garmon*, States cannot regulate conduct 'that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174*, 598 U.S. 771, 776 (2023) (quoting *Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)); *see also San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244 (1959) ("When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield."). "The party claiming preemption bears the burden of demonstrating that the challenged activity is arguably prohibited by the NLRA." *Milne Emps. Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1414 (9th Cir. 1992).

The NLRA does not preempt Measure 119 under *Garmon*, because Measure 119 does not infringe upon employees' rights under the NLRA, and it does not restrict employer speech

regarding the merits of unionization. Moreover, even if *Garmon* preemption did apply, Measure 119 fits comfortably within the Supreme Court's recognized exception for the states' maintenance of public safety and "domestic peace." *Garmon*, 359 U.S. at 247.

> **a.    Measure 119 does not impede employees' rights to choose their own exclusive representative.**

As the State rightly observes, Measure 119 imposes a requirement upon *employers*, not upon employees. Dkt. Entry 19 at 21. Moreover, contrary to Plaintiffs' arguments, a "labor peace agreement" under Measure 119 is not tantamount to a collective bargaining agreement. By signing a "labor peace agreement" pursuant to Measure 119, an employer does not recognize the bona fide labor organization as the exclusive representative of its employees in any way. Therefore, by entering into a labor peace agreement pursuant to Measure 119, an employer does not interfere with employees' Section 7 rights to choose their exclusive bargaining representative. It is well-settled law that an employer who negotiates and signs a "pre-recognition agreement," a "labor peace agreement," or the slightly-different "neutrality agreement" does not commit an unfair labor practice or run afoul of the LMRA's prohibition on material assistance to a labor organization. *See Dana Corp.*, 356 NLRB 256, 259–60 (2010) (collecting and discussing cases). Plaintiffs' arguments to the contrary lack merit.

> **b.    The text of Measure 119 does not restrict employer speech regarding the employer's views on unionization.**

Plaintiffs argue that Measure 119 forces employers "to take a neutral stance with respect to unionization." Dkt. Entry 11 at 28. That is not true.

By its plain text, Measure 119 requires that employer signatories to a labor peace agreement must agree "to remain neutral with respect to a bona fide labor organization's

representatives communicating with the employees of the applicant or the licensee about the
rights afforded to such employees under ORS 663.110." Measure 119, Section 3(g). That is, an
employer need only agree that it will remain neutral regarding a limited slice of the labor
organization's conduct: the labor organization's communicating with and educating employees
regarding their state statutory rights "to self-organization; to form, join or assist labor
organizations; to bargain collectively through representatives of their own choosing; and to
engage in other concerted activities for the purpose of collective bargaining or other mutual aid
or protection," as well as their "right to refrain from any or all of such activities." ORS 663.110.

Nothing in Measure 119 requires an employer to censor its *own* views regarding whether
unionization of its employees is advisable, and an employer who complies with the minimum
requirements of Measure 119 remains free to communicate its views to its employees as long as
the employer does not interfere with the labor organization informing those employees about
their rights.

### c. The NLRA does not grant an employer independent statutory free speech rights.

Plaintiffs incorrectly argue that employer free speech is explicitly protected under Section
8(c) of the NLRA for the purposes of *Garmon* preemption. *Garmon* preemption, which has its
roots in the supremacy of federal statutory law over conflicting state law, applies only to conduct
that the NLRA "arguably protects or prohibits." *Gould*, 475 U.S. at 286. "When it is clear or may
fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the
National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the
federal enactment requires that state jurisdiction must yield." *Garmon*, 359 U.S. at 244. But the
source of an employer's free speech rights is not, as Plaintiffs construe it, a creature of the

Page 18 - (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

NLRA. It is not protected "by § 7 of the National Labor Relations Act," nor does it "constitute an unfair labor practice under § 8." *Id.* Instead, as the Supreme Court has repeatedly affirmed, an employer's right to express noncoercive speech in labor relations derives directly from the First Amendment to the Constitution. Thus, *Garmon* preemption is not applicable here, where employers argue Measure 119 is preempted by the NLRA because it interferes with their free speech rights. That, instead, is a concern for the First Amendment.

In *NLRB v. Virginia Electric & Power Company*, 314 U.S. 469, 477 (1941), the Supreme Court recognized that an employer has a First Amendment right to engage in noncoercive speech regarding the merits of unionization.

After the *Virginia Electric* decision and a series of NLRB decisions concerning employers' constitutional free speech rights,[2] Congress added Section 8(c) to the NLRA, which reads:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). The Supreme Court has clarified that Section 8(c) "merely implements the First Amendment by requiring that the expression of 'any views, argument, or opinion' shall not be 'evidence of an unfair labor practice,' so long as such expression contains 'no threat of reprisal or force or promise of benefit' in violation of § 8 (a)(1). Section 8 (a)(1), in turn, prohibits interference, restraint or coercion of employees in the exercise of their right to self-organization." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

---

[2] Robert A. Gorman & Matthew W. Finkin, *Labor Law Analysis and Advocacy* 212 (2013).

In other words, Section 8(c) serves as an evidentiary rule and an affirmative defense in the context of unfair labor practice cases. To that end, it reinforces an employer's First Amendment rights to noncoercive speech (as recognized in *Virginia Electric*), but it is not an independent fount of those rights. "[S]ection 8(c) is 'no more than a restatement of the principle embodied in the First Amendment.'" *Great W. Broad. Corp. v. NLRB*, 310 F.2d 591, 599 (9th Cir. 1962) (quoting *NLRB v. LaSalle Steel Co.*, 178 F.2d 829, 835 (7th Cir. 1949)).

Section 8(c) plays a limited role in the legislative scheme instituted through the NLRA, especially when applied to speech by an employer. For instance, it is well-established that Section 8(c) does not apply in the context of representation proceedings. *See, e.g.*, *Hahn Property Management Corp.*, 263 NLRB 586, 586 (1982); *Rosewood Mfg. Co., Inc.*, 263 NLRB 420, 420 (1982); *Dal-Tex Optical Co., Inc.*, 137 NLRB 1782, 1787 n.11 (1962) (explaining that "Congress specifically limited Section 8(c) to the adversary proceedings involved in unfair labor practice cases and it has no application to representation cases," but noting that "[t]he strictures of the [F]irst [A]mendment, to be sure, must be considered in all cases").

According to the Supreme Court, Section 8(c) was designed to serve a limited purpose with respect to employer speech:

> The wording of the statute indicates, however, that § 8(c) was not designed to serve [congressional intent to encourage free debate] by immunizing all statements made in the course of a labor controversy. . . . It is more likely that Congress adopted this section for a narrower purpose, i.e., to prevent the Board from attributing anti-union motive to an employer on the basis of his past statements. Comparison with the express protection given union members to criticize the management of their unions and the conduct of their officers, 73 Stat. 523 (1959), 29 U.S.C. § 411(a)(2) (1964 ed.), strengthens this interpretation of congressional intent.

*Linn v. United Plant Guard Workers*, 383 U.S. 53, 62 n.5 (1966) (citing H.R. Rep. No. 510, 80th

Cong., 1st Sess., 45 (1947)). The context of labor relations also qualifies the First Amendment

speech rights of employers as reflected in Section 8(c):

> [W]hat is basically at stake is the establishment of a nonpermanent, limited
> relationship between the employer, his economically dependent employee and his
> union agent, not the election of legislators or the enactment of legislation whereby
> that relationship is ultimately defined and where the independent voter may be
> freer to listen more objectively and employers as a class freer to talk.

*Gissel*, 395 U.S. at 617–18.

As federal courts have observed, given Section 8(c)'s unique and limited role in the

statutory scheme, claiming *Garmon* preemption on the basis of a right to employer free speech is

in tension with the rationale of *Garmon* itself. For example, as the D.C. Circuit has explained:

> Fitting a *Garmon* claim under the language of § 8(c) is awkward. That provision is
> expressly aimed at a special problem—the risk that a party's advocacy ("views,
> argument, or opinion") might be burdened (considered "evidence of an unfair
> labor practice") even though it contained "no threat of reprisal or force or promise
> of benefit." 29 U.S.C. § 158(c). Thus § 8(c) works to negate an unfair labor
> practice claim against an employer posting a notice. But that gives it only a
> peripheral link to the subject of *Garmon*. Even if we delete *Garmon*'s references
> to specific sections, the activities described in § 8(c) do not "constitute an unfair
> labor practice," except by negation, and are not "protected by" the NLRA, except
> from the NLRA itself.

*UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 364–65 (D.C. Cir. 2003).

The Ninth Circuit has held that *Garmon* preemption does not apply to an employer free

speech claim under Section 8(c) of the NLRA, and the Supreme Court expressly declined to

disrupt that holding. *See Chamber of Commerce of the United States v. Brown*, 554 U.S. 60, 66

(2008) (finding the statute preempted under *Machinists* but declining to decide whether *Garmon*

applied). In *Brown*, an en banc panel of the U.S. Court of Appeals for the Ninth Circuit held that

a California statute – which forbid employers who received state funds from using that money to

Page 21 - (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

assist, promote, or deter union organizing – was not preempted under *Garmon* or *Machinists*. *See*

*generally Chamber of Commerce of the United States v. Lockyer*, 463 F.3d 1076 (9th Cir. 2006)

(en banc), *reversed and remanded by Brown*, 554 U.S. 60. Reflecting the concerns raised by

numerous federal courts across the country, the Ninth Circuit explained why *Garmon* preemption

analysis is a poor fit for an employer free speech claim under Section 8(c):

> Section 8(c) prohibits sanctioning employers under the NLRA for engaging in an
> unfair labor practice when they exercise speech rights that are guaranteed by the
> First Amendment. This subsection can be termed the "free speech exemption" to
> section 8's delineation of unfair labor practices, because it carves out noncoercive
> speech from the category of actually punishable activity. Notwithstanding the
> dissent's mistaken insistence to the contrary, section 8(c) does not grant
> employers speech rights. (Dissent at 11824.) Rather, it simply prohibits their
> noncoercive speech from being used as evidence of an unfair labor practice.

*Lockyer*, 463 F.3d at 1091.

While the Supreme Court ultimately reversed the en banc panel's decision on the grounds

that the NLRA preempted the California statute under *Machinists*, it expressly stated, "We do not

reach the question whether the provisions would also be pre-empted under *Garmon*." *Id.* at 66.

The Supreme Court's *Brown* decision, moreover, described Section 8(c) as evincing Congress's

intent "to leave noncoercive speech unregulated," which meant that the NLRA preempted the

California statute in that case under *Machinists*. *Id.* at 68. But the Supreme Court did not identify

Section 8(c) as protecting a Section 7 right or prohibiting Section 8 conduct—as would be

relevant for *Garmon* preemption. *See generally id.* The Court also did not remark on the en banc

panel's conclusion that Section 8(c) does not grant employers free speech rights separate from

the First Amendment.

Any argument by Plaintiffs that they—as employers—have a separate statutory protected right to free speech under Section 8(c) of the NLRA for the purposes of *Garmon* preemption does not accord with the current state of federal law nor with the text of *Garmon* itself.

> **d.    Even if *Garmon* preemption applied to Measure 119, the "local feeling and responsibility" exception would apply.**

In *Garmon*, the Supreme Court recognized several exceptions to NLRA preemption. As relevant here, the Court held that "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon*, 359 U.S. at 244. This exception, which has come to be known as the "local feeling and responsibility" exception, is aimed at protecting states' police powers: "State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." *Id.* at 247.

The Supreme Court has given particular weight to the "local feeling and responsibility" exception in cases involving state regulation aimed at safeguarding public safety and preventing violence or the threat thereof. *See, e.g.*, *Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290, 299 (1977) (collecting cases); *see also United Auto., etc. v. Wis. Emp't Relations Bd.*, 351 U.S. 266, 274 (1956) ("The dominant interest of the State in preventing violence and property damage cannot be questioned. It is a matter of genuine local concern."). The Supreme Court has also construed *Garmon*'s "local feeling and responsibility" exception as applicable to issues "so deeply rooted in local law that the courts should not assume that Congress intended to pre-empt the application of state law." *Belknap, Inc. v. Hale*, 463 U.S. 491, 509 (1983).

As explained above, Measure 119 does not interfere with employees' rights to choose or not choose an exclusive bargaining representative, and it also does not disrupt an employer's prerogative to express their views on unionization. Accordingly, Measure 119 does not attempt to regulate activities "protected by § 7 of the National Labor Relations Act," nor those that "constitute an unfair labor practice under § 8," and *Garmon* preemption does not apply. *Garmon*, 359 U.S. at 244. But even if this Court disagrees and determines that *Garmon* preemption does apply, Measure 119 fits comfortably within the "local feeling and responsibility" exception as part of the state's inherent powers to improve the safety of an industry that is plagued by violence due to its operation in a legal grey zone.

Here, Measure 119 is tied to Oregon's extensive cannabis licensing scheme. This means that it is an integral part of the state's efforts to police the line between legitimate cannabis operations and illegal unauthorized ones. Oregon's cannabis licensing structure is "deeply rooted in local law," given that Congress has made commercial cannabis sales illegal under federal law, and Oregon also has outlawed the sale of cannabis except through licensed retailers and dispensaries. ORS 475C.257; 475C.345; 475C.349; 475C.353.

Oregon's cannabis industry is tightly regulated under the lengthy Chapter 475C of the Oregon Revised Statutes, as well as regulations passed by state agencies pursuant to that chapter. *See generally* ORS 475C.001 *et seq.*; *see also* OAR 845-025-1000 *et seq.* The strict requirements placed upon cannabis licensees in Oregon include, among many others: that a cannabis retailer or medical dispensary be located more than 1,000 feet away from a pre-kindergarten, kindergarten, or school; prohibitions against on-site consumption of any intoxicants, including cannabis and alcohol; required 24/7 video surveillance systems with specific capabilities; and regular detailed

logs of all employees on site and all deliveries/transfers of cannabis products. ORS 475C.097;

475C.101; 475C.177; 475C.833; 475C.840; OAR 845-025-1230(6)(b) & (9); 845-025-1450;

845-025-2120(3); 845-025-2880. In recent years, the Oregon Legislature has added to its

comprehensive cannabis regulatory scheme, for example, by creating a state-grant-funded

program to increase law enforcement efforts to crack down on illegal cannabis operations, 2018

Or. Laws c. 103 § 13, *codified at* ORS 475C.531, and by requiring cannabis employees to report

suspected sex trafficking or human trafficking at a licensed premises, 2022 Or. Laws c. 117 § 2,

*codified at* ORS 475C.287.

Measure 119 is also part of Oregon voters' response to an epidemic of armed violence

against cannabis workers across the state in recent years. *See* Part III.A, *supra*. Oregon's national

congressional representatives have repeatedly pushed Congress—without success thus far—to

reform its current banking laws, which leave cannabis shops with large amounts of cash on hand.

This further endangers Oregon's cannabis workers by exposing them to the continued risk of

armed robbery. By allowing for labor organizations to educate employers about their rights to

advocate for themselves and form or refrain from forming a union, Measure 119 provides a state-

level intervention to address Oregon's cannabis shop violence epidemic.

Given the Oregon Legislature and state voters' continued concern for public safety and

tight regulation of the legalized cannabis industry in Oregon, Measure 119 appropriately fits

within the "local feeling and responsibility" exception to *Garmon* preemption.

### 3.     The NLRA does not preempt Measure 119 under *Machinists*.

Plaintiffs are incorrect that Measure 119 is preempted under *Machinists*. To arrive at their

conclusion, Plaintiffs turn Measure 119 into something that it is not. Plaintiffs argue that

Measure 119 "muzzles" employers and requires them "by law to agree to remain silent." Dkt. Entry 11 at 20–21. As described above, that is not what Measure 119 requires. Measure 119 only requires that an employer agree "to remain neutral with respect to a bona fide labor organization's representatives communicating" with the employer's employees regarding their rights to form or refrain from forming a union. In other words, Measure 119 requires an employer to remain neutral regarding a union's act of communicating with the employer's employees about the existence of their labor rights. It does not "muzzle" an employer but leaves the employer free to discuss its own views on the merits of unionization.

The *Machinists* doctrine holds that state regulation of some activities not expressly or arguably protected or prohibited by the NLRA (and thus not subject to *Garmon* preemption) may nonetheless be preempted if the activities are "economic weapons" that Congress intended to remain "unregulated and to be controlled by the free play of economic forces." *Int'l Ass'n of Machinists & Aero. Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 144 (1976). The Supreme Court has recognized that, for the purposes of *Machinists*, Congress intended to leave unregulated "free debate on issues dividing labor and management." *Brown*, 554 U.S. at 67 (quoting *Linn*, 383 U.S. at 62).

Unlike in *Brown*, Measure 119 does not regulate "free debate on issues dividing labor and management," nor does it force an employer to forgo their right to communicate their views to employees. *Id.* at 67, 73. At bottom, Measure 119 provides a mechanism for cannabis employees to receive information about their basic rights to act and/or refrain from acting collectively. Under the text of Measure 119, as long as an employer does not prevent a bona fide labor organization from providing that basic legal information, the employer remains entirely free to

express their views on unionization and engage in spirited debate with unions who assist in

organizing their employees. An employer's denial of the basic existence of an employee's right

to organize or refrain from organizing is not an "economic weapon" under *Machinists*; it is a

denial of a baseline reality. What Measure 119 requires at minimum is not functionally different

than an employer's agreement to allow a labor organization to inform employees of the bare fact

that labor laws exist, or that the 13th Amendment expressly prohibits involuntary servitude.

Recognition of the existence of a fundamental legal principle like employees' labor rights is not

an endorsement nor rebuke of the merits of those labor rights nor a mandate regarding how

individuals choose to act in light of those rights. A comparison between Measure 119 and the

state statute at issue in *Brown* reinforces this crucial difference.

In *Brown*, the State of California passed AB 1889, which prohibited private employers

from using state funds "to assist, promote, or deter union organizing." The Supreme Court

described the function of AB 1889 as follows:

> AB 1889 prohibits certain employers that receive state funds—whether by
> reimbursement, grant, contract, use of state property, or pursuant to a state
> program—from using such funds to "assist, promote, or deter union organizing."
> *See* Cal. Govt. Code Ann. §§ 16645.1 to 16645.7. This prohibition encompasses
> "any attempt by an employer to influence the decision of its employees" regarding
> "[w]hether to support or oppose a labor organization" and "[w]hether to become a
> member of any labor organization." § 16645(a). The statute specifies that the
> spending restriction applies to "any expense, including legal and consulting fees
> and salaries of supervisors and employees, incurred for . . . an activity to assist,
> promote, or deter union organizing." § 16646(a).

> Despite the neutral statement of policy quoted above, AB 1889 expressly exempts
> "activit[ies] performed" or "expense[s] incurred" in connection with certain
> undertakings that promote unionization, including "[a]llowing a labor
> organization or its representatives access to the employer's facilities or property,"
> and "[n]egotiating, entering into, or carrying out a voluntary recognition
> agreement with a labor organization." §§ 16647(b), (d).

*Brown*, 554 U.S. at 63 (alterations in quoting source).  Thus, the Supreme Court in *Brown* applied *Machinists* where the state law tilted the playing field of economic forces by preventing employers from using state funding to express opposition to union organizing but allowing them to use such funds to promote unionization.

Measure 119 is a far cry from the statute at issue in *Brown*. Unlike AB 1889, Measure 119 does not attempt to prohibit "any attempt" by an employer to express its views on unionization to its employees or to dissuade them from unionizing. Rather, Measure 119's minimum requirements merely provide for an employer's agreement to respect a labor organization's provision of information to cannabis employees regarding their basic rights to form or not form a union. Put differently, Measure 119 provides an unimpeded vehicle for the delivery of basic statutory information about cannabis workers' rights to (or not to) organize—but the subsequent debate about the merits of whether the employees should exercise those rights remains as "uninhibited, robust, and wide-open" as ever. *Brown*, 554 U.S. at 68 (quoting *Letter Carriers v. Austin*, 418 U.S. 264, 272–73 (1974)).

Finally and separately, as the District Court for the Southern District of California recently has pointed out with respect to California's current cannabis labor peace statute (which is far more robust than Oregon's Measure 119), the industry context of the state-regulated activity matters for *Machinists* preemption analysis. There, as the district court highlighted, Congress could not have intended to leave employer speech in the cannabis industry to the "free play of economic forces," because "Congress enacted the CSA [Controlled Substances Act] and declared that every commercial cannabis transaction is illegal under federal law, thereby eliminating the federal cannabis market." *Ctrl Alt Destroy v. Elliott*, No. 24-CV-753 TWR

(AHG), 2025 U.S. Dist. LEXIS 45251, at *17 n.8 (S.D. Cal. Mar. 12, 2025). In other words, Congress could not have recognized employer speech as an "economic weapon" in the cannabis industry if Congress clearly stated its intent that no cannabis industry would/should exist at all.

Under either frame of analysis, the NLRA does not preempt Measure 119 under *Machinists*.

## IV.    CONCLUSION

For the reasons stated above, we respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted on this 31st day of March, 2025.

By: s/ Noah T. Barish
        Noah T.  Barish, OSB #105847
        MCKANNA BISHOP JOFFE, LLP
        Of Attorneys for (Proposed) *Amicus Curiae*
        Oregon AFL-CIO

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing (PROPOSED) BRIEF OF *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS on:

Stephen M. Scott
Fisher & Phillips LLP
111 SW Fifth Avenue, Suite 4040
Portland, OR 97204
smscott@fisherphillips.com
*Attorney for Plaintiffs*

Todd A. Lyon
Fisher & Phillips LLP
111 SW Fifth Avenue, Suite 4040
Portland, OR 97204
tlyon@fisherphillips.com
*Attorney for Plaintiffs*

Janelle W. Debes
Fisher & Phillips LLP
111 SW Fifth Avenue, Suite 4040
Portland, OR 97204
jdebes@fisherphillips.com
*Attorney for Plaintiffs*

Alexander A. Wheatley
Fisher & Phillips LLP
111 SW Fifth Avenue, Suite 4040
Portland, OR 97204
awheatley@fisherphillips.com
*Attorney for Plaintiffs*

Sadie Forzley
Oregon Department of Justice
Trial Division
100 SW Market Street
Portland, OR 97201
sadie.forzley@doj.oregon.gov
*Attorneys for Defendants*

YoungWoo Joh
Oregon Department of Justice
Trial Division
100 SW Market Street
Portland, OR 97201
youngwoo.joh@doj.oregon.gov
*Attorney for Defendants*

● by **Electronic Filing using the Court's ECF System** and email at the email(s) on record and listed above on the date set forth below.

DATED March 31, 2025.     MCKANNA BISHOP JOFFE, LLP

/s/ Noah T. Barish
Noah T.  Barish, OSB #105847
MCKANNA BISHOP JOFFE, LLP
1635 NW Johnson St., Portland, OR 97209
503-821-0960
nbarish@mbjlaw.com
Of Attorneys for (Proposed) *Amicus Curiae*
Oregon AFL-CIO

CERTIFICATE OF SERVICE